UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHERYL BAKKER,                          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        No. 4:10 CV 1582 DDN
                                        )
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
                Defendant.              )


**MEMORANDUM**

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Cheryl Bakker for disability insurance benefits
under Title II of the Social Security Act, 42 U.S.C. 401, et seq. The
parties have consented to the exercise of plenary authority by the
undersigned United States Magistrate Judge pursuant to 28 U.S.C.
§ 636(c). (Doc. 3.) For the reasons set forth below, the ALJ's decision
is affirmed.


**I.  BACKGROUND**

Plaintiff Cheryl Bakker was born on August 26, 1958, and was 51
years of age at the time of the hearing before the administrative law
judge (ALJ). (Tr. 26.) She is 5 feet 5 inches tall, weighing between
130 and 138 pounds. (Tr. 27.) She is married and has three adult
children of her own and two adult stepchildren. (Tr. 25, 110.) She lives
on a three acre lot in a mobile home with her husband. (Tr. 26.) She
went to school through the twelfth grade and is trained in sign painting
and lettering. (Id.) She last worked in November 2007 as a lead
inspector at a tee-shirt printing company. (Tr. 29-30.) This position
required her to lift boxes weighing between 40 and 78 pounds. (Tr. 30.)
She worked in that capacity for three years. (Tr. 31.) Before that she
was an assembly line worker, forklift operator, and plastic mixer at
Nike. (Tr. 31-32.) Before that, she worked as a customer service
manager at Wal-Mart, and a waitress at Crossroads Cafeteria. (Tr. 33.)

On July 25, 2008, plaintiff applied for disability insurance benefits, alleging an onset date of November 1, 2007. (Tr. 109-11.) Plaintiff's claims were denied on September 2, 2008. (Tr. 61.) After a hearing on December 8, 2009 (Tr. 21-54), the ALJ denied plaintiff benefits on January 22, 2010. (Tr. 6-20.) On July 20, 2010, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. ADMINISTRATIVE RECORD

On August 1, 2006, plaintiff began care with her primary physician, Dr. Jeffrey Zohner, a board certified internist. (Tr. 155.) Plaintiff had been under Dr. Zohner's care for more than three years as of July 2009, when her last documented annual physical examination occurred. (Tr. 201.)

On October 4, 2006, plaintiff had a mammogram that revealed a focal asymmetry in the right breast. Dr. Geoffrey Hamill recommended additional imaging and an ultrasound exam. (Tr. 219.)

On October 6, 2006, the MRI ordered by Dr. Zohner of plaintiff's lumbar spine revealed a left lateral foraminal disc protrusion at L5/S1, posterior disc bulging[1] with a central disc protrusion at L4/L5, and postoperative change on the left at L3/L4 with posterior disc bulging. (Tr. 222.)

On November 1, 2006, plaintiff had a mammogram which revealed a nodule in the right breast. The mammogram also revealed that the distinctive nodule noted during plaintiff's October 4, 2006 mammogram was at that time less distinct. (Tr. 218.)

On December 19, 2006, plaintiff did not attend a scheduled physical therapy appointment. At that time, she was receiving therapy for her hip, buttocks, back, and leg pain. (Tr. 228.)

On December 26, 2006, physical therapist Tracy Hill noted that plaintiff complained of pain in her hip, buttocks, and leg on the right

---

[1] Posterior disc bulging occurs when a disc extends outside the space it should normally occupy in the spinal column. Mayo Clinic, http://www.mayclinic.com/health/bulging-disk/AN00272 (last visited July 1, 2011).

side at an intensity of six of ten, pain in the lower back at an intensity of three of ten, and a sharp burning sensation in the right buttock. The therapist reported a palpable knot just lateral to the lumbar scar. (Tr. 228.)

On December 28, 2006, Ms. Hill noted that plaintiff complained of right hip and buttock pain at an intensity of eight out of ten. Plaintiff also complained of lower back pain at an intensity of two-to-three out of ten. Plaintiff also reported that she had been limping as her back pain increased with prolonged sitting. (Id.)

On January 2, 2007, Ms. Hill noted that plaintiff complained of lower back pain at an intensity of zero out of ten and right hip and buttock pain at an intensity of five out of ten, eight at its worst. (Id.) Ms. Hill also noted that plaintiff's range of motion was limited to twenty-five percent when side-bending to the right. (Id.)

On January 4, 2007, plaintiff missed a physical therapy appointment. (Tr. 229.)

On April 24, 2007, because of back pain, plaintiff visited a radiologist at St. Joseph Health Center to get an x-ray of her spine. (Tr. 217.) The x-ray revealed moderate degenerative disc disease at L3-L4, L4-L5, and L5-S1; an old anterior superior fracture at L4; and gallstones. (Id.)

On August 21, 2007, upon complaints of abdominal pain, Dr. Zohner ordered an ultrasound exam of plaintiff's abdomen. (Tr. 211.) The ultrasound revealed multiple layering gallstones, a thickening gallbladder wall, and cholelithiasis[2] with no sonographic evidence of cholecystitis[3]. (Id.)

On August 30, 2007, plaintiff visited Dr. Christopher Cronin for complaints of epigastric pain and burning in her chest and throat. Dr.

---

[2] Cholelithiasis is the presence of gallstones in the gallbladder. Gallstones are small pebble-like substances that develop in the gallbladder, causing stomach pain and nausea. WebMD, http://www.webmd.com/com/digestive-disorders/gallstones-directory (last visited July 1, 2011).

[3] Cholecystitis is an inflammation of the gallbladder. Mayo Clinic, http://www.mayoclinic.com/health/cholecystitis/DS01153 (last visited July 1, 2011).

Cronin diagnosed plaintiff with biliary colic.[4]  An ultrasound also revealed multiple gallstones.  Dr. Cronin recommended a laprascopic cholecystectomy.[5]  It was noted that plaintiff was on proton pump inhibitors[6] and Vicodin at that time, but had little pain relief despite the medications.  (Tr. 208.)

On September 17, 2007, Dr. Cronin performed the recommended laprascopic cholecystectomy and removed plaintiff's gallbladder.  (Tr. 209.)  Plaintiff's post-operation final diagnosis was bilary colic.  (Tr. 233.)  After visiting Dr. Cronin on September 27, 2007, Dr. Cronin reported that plaintiff was pain free and could be released to work in a few weeks.  (Tr. 207.)

On October 15, 2007, plaintiff told Dr. Zohner that she had no chest pain or shortness of breath with hiking, hunting, fishing, or yard work. (Tr. 273.)

On October 17, 2007, plaintiff's mammography report was abnormal and revealed nodular density in the right breast.  Dr. Lisa Oakley recommended further evaluation.  (Tr. 215.)

On November 16, 2007, after a bilateral sonogram, the overall assessment was benign.  (Tr. 284-85.)

On April 8, 2008, Dr. Edward Schlafly wrote to Dr. Zohner and reported that plaintiff had an x-ray that demonstrated spur formation and subchondral sclerosis[7] of the greater tuberosity.  Dr. Schlafly also

---

[4] Bilary colic is intense spasmodic pain felt in the right upper quadrant of the abdomen from impaction of a gallstone in the cystic duct. Stedman's Medical Dictionary 407 (Lipincott et al. eds., 28th ed. 2006).

[5] Cholecystectomy is a surgical procedure to remove the gallbladder. Mayo Clinic, http://mayoclinic.com/health/cholecystectomy/MY00372 (last visited July 1, 2011).

[6] Proton pump inhibitors are used to treat certain gastrointestinal disorders and work by reducing the amount of acid in the stomach.  They are available both as prescription and as over-the-counter medications. F D A ,  U S   F o o d   a n d   D r u g   A d m i n i s t r a t i o n , http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm213259.htm (last visited July 1, 2011).

[7] Subchondral sclerosis is an increased bone density or thickening in the layer of bone just below the cartilage.
(continued...)

reported that he believed plaintiff had "some rotator cuff disease," and a frozen shoulder. (Tr. 259.)

On April 10, 2008, per Dr. Schlafly's orders, plaintiff received an MRI of her left shoulder, which revealed a small focal full-thickness tear of the anterior insertion of the supraspinatus tendon[8]. (Tr. 249-50.)

On May 14, 2008, plaintiff was admitted to St. Luke's Hospital, where Dr. Schlafly manipulated and repaired her left rotator cuff tear. (Tr. 238.) Dr. Schlafly noted that plaintiff reported the onset of left shoulder pain in February 2008, and that her range of motion was considerably limited. (Tr. 257.) Plaintiff also reported a frozen shoulder that she could only move with severe pain. (Id.) An MRI confirmed the torn rotator cuff and frozen shoulder. (Tr. 238.) In Dr. Schlafly's May 29, 2008 report, he said plaintiff complained of burning and pain that sometimes radiated into her elbow when her arm was bent or after it had hung down for too long. (Tr. 257.)

Between May 29 and July 29, 2008, plaintiff attended sixteen physical therapy sessions for her shoulder. (Tr. 261.)

On July 1, 2008, plaintiff rated her shoulder pain at an intensity of two out of ten. The therapist noted visible left arm weakness with therapeutic exercise, and opined that plaintiff would benefit from physical therapy to improve her range of motion and strength. At that time, Dr. Schlafly prescribed continued physical therapy twice a week. (Tr. 251.)

On July 29, 2008, plaintiff reported an increase in ease when she reached her left hand behind her back, and her shoulder pain had decreased to an intensity of one out of ten. (Tr. 261.) Once again, the therapist recommended plaintiff continue physical therapy twice a week to improve her range of motion and strength. (Id.) Plaintiff last visited the physical therapist in September 2008. (Tr. 194.)

---

[7](...continued)
http://www.osteoarthritis.about.com/ (last visited July 1, 2011).

[8] The supraspinatus tendon is the tendon which contributes to the rotator cuff. Stedman's, supra, 1255.

On June 19, 2008, plaintiff saw Dr. Zohner for an annual physical examination. Dr. Zohner reported that overall plaintiff was in very good health. Plaintiff reported that she walked one to three miles twice a week and gardened. Dr. Zohner also noted that plaintiff's Duke Activity Status Index[9] was better than average, which evidenced good capacity for vigorous exercise with some restriction due to her back. Dr. Zohner reported that the physical portion of plaintiff's exam was unremarkable. The Burns Depression Checklist[10] showed borderline symptoms of low mood.[11] Dr. Zohner reported drowsiness was not a problem. He recommended that plaintiff do pilates to help with musculoskeletal problems and to continue the therapy that she was already doing. (Tr. 316-37.)

On July 14, 2008, Dr. Schlafly saw plaintiff for a two months post-operation visit regarding her torn rotator cuff repair. Dr. Schlafly reported plaintiff was doing reasonably well, was progressing, and that sensation and circulation in her hand were fine. (Tr. 246.)

On July 18, 2008, G. Brian completed a Disability Report Form SSA-3367. (Tr. 147.) During the teleconference with plaintiff, Brian noted that plaintiff alleged an onset date of November 1, 2007; plaintiff was not participating in substantial gainful activity; and that plaintiff was able to answer all questions appropriately with no limitations observed during the course of the interview. (Tr. 147-49.)

On July 29, 2008, plaintiff applied for worker's compensation for an alleged injury while working for Nike on August 5, 1997. (Tr. 115.)

---

[9]The Duke Activity Status Index is a self-administered questionnaire that measures a patient's functional capacity. It can be used to get a rough estimate of a patient's peak oxygen uptake.

[10] The Burns Depression Checklist is composed of up to twenty-five different symptoms. The patient indicates the severity of her symptoms by placing a checkmark in the appropriate box on the list. Raw scores are interpreted into levels of depression, and results are recorded over time to track the severity of symptoms. Univ. of California, Berkley, http://uhs.berkeley.edu/home/healthtopics/PDF%20Handouts/Depression%20 Check%20List.pdf (last visited July 1, 2011).

[11] Plaintiff's total score was one mark higher than the cutoff for minimal or no depression. (Tr. 329.) A score of zero to four is minimal or no depression; a score of five to ten is borderline depression. (Id.) Plaintiff's score was a five.

The extent of the resultant care and injuries were disputed. Plaintiff settled the claim for $27,842. (Tr. 117.)

On July 31, 2008, plaintiff's husband, Glennon Bakker, completed a Third Party Adult Function Report. (Tr. 180.) Mr. Bakker stated that he had known plaintiff for five years and spent all of his time with her. (Id.) He listed plaintiff's activities as: waking up at 5:30 a.m. each day; taking a pain pill; making breakfast; doing yard work, house work, and exercises; making a small lunch; taking another pain pill; walking short distances; doing more house work; watching TV while sitting and standing; exercising more; taking another pain pill; and going to bed. (Tr. 180-88.) Mr. Bakker also reported helping plaintiff with the household chores. (Tr. 181.) According to Mr. Bakker, plaintiff could no longer work, swim, run, bike or hike due to her injuries, which caused her back and shoulder pain and affected her sleep, although her cooking habits had not changed since her injuries. She generally spent thirty to forty-five minutes preparing a meal. (Tr. 181-82.)

On August 4, 2008, plaintiff saw Dr. Schlafly for a two and a half months post-operation visit; this was the last noted visit with Dr. Schlafly regarding plaintiff's torn rotator cuff repair and frozen shoulder. He reported that plaintiff had pain, therapy was helping, and she was fighting a frozen shoulder, but had good strength. Dr. Schlafly requested that plaintiff report her progress to him in three or four weeks at which time he could determine whether a manipulation was necessary. Dr. Schlafly also noted plaintiff had not hit a wall yet and hoped a manipulation would not be necessary. However, plaintiff was still fighting a frozen shoulder. (Tr. 246.) There is no follow up visit on record. (Tr. 243-63.)

On August 11, 2008, plaintiff had a colonoscopy which revealed no immediate complications. (Tr. 313.)

On September 2, 2008, Paul Lossman completed a Physical Residual Functional Capacity (RFC) Assessment. (Tr. 264.) Mr. Lossman's primary diagnoses of plaintiff's impairments were degenerative disc disorder, a rotator cuff tear, and repair with a secondary diagnosis of gallstones. (Id.) Plaintiff's exertional limitations were: only occasionally lifting or carrying twenty pounds; frequently lifting up to ten pounds; standing

and/or walking about six hours in an eight-hour workday; and sitting about six hours in an eight-hour workday. (Tr. 265.) Plaintiff's postural limitations were: frequently climbing ramps and stairs and balancing; occasionally climbing ladders, ropes, and scaffolds, and stooping, kneeling, crouching, and crawling. (Tr. 267.) Mr. Lossman also opined that plaintiff was limited in her ability to reach in all directions, but had no other manipulative limitations. (Id.)

On October 3, 2008, Dr. Zohner noted that plaintiff complained of back pain radiating into her left thigh which was worse with walking long distances or sitting but better with standing. Plaintiff also complained of severe pain in the base of her neck, wrist, and knees. Plaintiff was prescribed Vicodin and Flexeril, a narcotic and muscle relaxant respectively, and an MRI of the lumbar spine was ordered. Dr. Zohner also noted plaintiff "sleeps ok," walked her three acre lot, and had good energy. (Tr. 276.)

On February 11, 2009, Dr. Zohner noted that plaintiff had lower back pain when standing or sitting with radiation into the right or left leg. Dr. Zohner prescribed Xanax, Vicodin, and Flexeril. (Tr. 304.)

On February 18, 2009, Dr. Bruce Witte performed an upper GI endoscopy for plaintiff and biopsied for histology.[12] Dr. Witte found a small hiatus hernia, and recommended that plaintiff wait for pathology results and consider a trial of Proton-pump inhibitor. (Tr. 309.)

On May 18, 2009, plaintiff visited Dr. Jim Schaberg, an orthopedist, who diagnosed her with arthritis in her left knee and treated it with a Cortisone injection to temporarily relieve the pain. (Tr. 199.) X-rays at that time showed patellofemoral degenerative changes. (Tr. 341.) Dr. Schaberg said he would order an MRI if the Cortisone did not help. (Tr. 340.) There are no follow up visits on record.

On June 18, 2009, plaintiff received another annual physical examination from Dr. Zohner. (Tr. 344.) Dr. Zohner noted that plaintiff was in very good health overall, despite suffering from arthritis and low

_____

[12] Histology is the microscopic evaluation of tissue slides prepared by technicians which allows a pathologist to identify or dismiss disease. Mayo Clinic, http://www.mayo.edu/mshs/histology-career.html (last visited July 1, 2011).

back pain.  The physical portion of plaintiff's exam was unremarkable, drowsiness was not a problem, and her mental status examination was normal.  (Id.)  The Burns depression checklist revealed borderline symptoms of low mood and the Duke Activity Status Index was decreased due to her back, although she retained the capacity for routine exercise.  (Id.)  Dr. Zohner suggested plaintiff try to exercise every day, seek a pain management specialist for her low back, and try acyclovir.[13]  (Id.)  Dr. Zohner also diagnosed plaintiff with arthritis in her knee and lower back with pain in both, and noted limited movement in her left shoulder with numbness and tingling in her feet.  (Tr. 199.)

As of August 10, 2009, plaintiff had the following prescriptions: Carisoprodol tablets prescribed by Dr. Zohner to reduce inflammation; Hydrocodone prescribed by Dr. Zohner for back pain; Ibuprofen prescribed by Dr. Zohner for back pain; Alprazolam prescribed by Dr. Zohner for anxiety or insomnia; Propranolol prescribed by Dr. Zohner for palpitations or tremors; and Rhinocort nasal spray prescribed by Dr. Zohner for sinus trouble.  (Tr. 201.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on December 8, 2009.  (Tr. 22-53.)  Plaintiff testified before the ALJ to the following facts. Plaintiff went to school through the twelfth grade, and she was trained in lettering and sign-painting through an eight month college program.  (Tr. 26.)  She worked as a lead supervisor for about three years.  She worked on an assembly line, operated a forklift, and mixed plastic for for Nike.  She worked as a customer service manager for Wal-Mart, and as a waitress for Crossroads Cafeteria.  (Tr. 29-33.)

Plaintiff last worked in November 2007, about eight months after she had suffered a back injury and was restricted to light work.  (Tr. 29.) She had suffered two back injuries before leaving work in 2007.  After her first injury around 1995, she settled a worker's compensation claim for $27,482 and underwent back surgery.  After suffering her second back

_____
[13] Acyclovir is a medication used to decrease pain.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000533 (last visited July 1, 2011).

- 9 -

injury around 2006, she missed a week and a half of work. Even though it was a work-related injury, she did not file a worker's compensation claim for the second back injury. (Tr. 28.) She left her job in November 2007 because she was in too much pain at work. Additionally, if she took medication at work to relieve the pain, she was unable to concentrate. (Tr. 30.) The light work she did involved inspecting boxes that twenty girls packaged with tee-shirts, and included lifting about one box weighing between 40 and 78 pounds every hour. (Id.)

Plaintiff's daily activities include driving, doing light housework, cooking, vacuuming one room, and grocery shopping. (Tr. 38.) She also does back exercises that her doctor gave her, checks her email, looks things up on the computer for her husband, walks around the perimeter of her three acre lot, dusts, does laundry, and pulls weeds. (Tr. 38-40.)

The ALJ asked plaintiff what medical conditions she had that impacted her work. (Tr. 34.) Plaintiff testified to the following. Her left arm has limited mobility causing her pain and tingling when she lifts it above her head or reaches out. (Tr. 34-35.) She had back surgery where a small section of her disc pads were removed. (Tr. 35.) She had rotator cuff surgery on her left arm. (Id.) She has pain with standing for longer than five to ten minutes, sitting for longer than ten to fifteen minutes, or walking for more than ten to fifteen minutes. (Tr. 40-41). She has arthritis in her left knee for which she takes Vicodin and Soma. (Tr. 36.) These medications make her sleepy, bump into walls, blur her vision, and make it hard for her to concentrate. (Id.) She can lift ten to fifteen pounds. (Tr. 40.)

On examination by her attorney, plaintiff gave the following testimony. She only spends five to ten minutes at a time on the computer.[14] (Tr. 42.) She lays down in the mornings for twenty to thirty minutes to relieve her back pain. (Tr. 43.) After laying down, if the back pain does not go away, then she will take pain medicine. (Id.) But, she prefers to wait until nighttime to take her pain medication because of how it affects her. (Id.)

---

[14]In a disability questionnaire that she filled out on July 29, 2008, plaintiff reported that she used the computer for twenty to thirty minutes in one sitting. (Tr. 178-79.)

Vocational Expert (VE), Delores Alvira Gonzales, also testified at
the hearing.  The VE identified plaintiff's past relevant work (PRW) as
a production line assembler, a forklift driver, a packer, mixer, customer
service representative, lead inspector, and waitress.  (Tr. 46-47.)  The
VE said that plaintiff could possibly use the customer service skills
that she has acquired to do other work.  (Tr. 47.)

The first hypothetical given to the VE by the ALJ took plaintiff's
education, training, and work experience into consideration.  It also
assumed that plaintiff could perform light work[15] with the exception of
never being able to crawl or to climb ropes, ladders, or scaffolds,
frequently reaching in all directions, and only occasionally climbing
stairs.  (Tr. 47-48.)  The VE testified that, with these limitations,
plaintiff could perform her PRW as a waitress, production assembler, or
customer service representative.  (Tr. 48.)

The second hypothetical was the same as the first except that the
ALJ added a sit-stand option with the ability to change positions
frequently.  (Id.)  The VE testified that, with these limitations,
plaintiff could perform only her PRW as a customer service
representative.  (Id.)

The third hypothetical was the same as the second except with the
additional limitation of occasionally reaching in all directions.  (Id.)
The VE testified that plaintiff did not have any PRW under the third
hypothetical.  (Id.)  But, the VE testified that plaintiff could work as

---

[15] The Commissioner's regulations define light work as work that

involves lifting no more than 20 pounds at a time with
frequent lifting or carrying of objects weighing up to 10
pounds.  Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of
walking or standing, or when it involves sitting most of the
time with some pushing and pulling of arm or leg controls.  To
be considered capable of performing a full or wide range of
light work, you must have the ability to do substantially all
of these activities.  If someone can do light work, we
determine that he or she can also do sedentary work, unless
there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

See 20 C.F.R. § 404.1567(b).

an account representative, usher, or surveillance system monitor with these limitations. (Tr. 49-50.)

The fourth hypothetical was the same as the third except with the additional limitation of two breaks in addition to a usual lunch break and two usual breaks. (Tr. 49.) The VE reported there were no jobs to fit this hypothetical. (Id.)

### III. DECISION OF THE ALJ

On January 22, 2010, the ALJ issued an unfavorable opinion. (Tr. 6-17.) At Step Two, the ALJ found that plaintiff had severe impairments of lumbar degenerative disc disease, a rotator cuff repair, and left knee pain treated with an injection; he found her impairments relating to gallbladder surgery and psychiatric impairments were non-severe. At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments under the Act. Then, the ALJ determined that plaintiff had the RFC to perform light work except that plaintiff can only occasionally climb stairs and ramps, kneel, and crouch; can never crawl or climb ropes, ladders, or scaffolds; and can frequently reach in all directions. The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to produce symptoms, but that her allegations concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they conflict with the ALJ's RFC determination. The ALJ found plaintiff's allegations were inconsistent with the record as a whole and were neither persuasive nor credible. At Step Four, the ALJ concluded plaintiff could perform her PRW as a customer service representative, waitress, and production assembler. The ALJ, therefore, ruled plaintiff was not disabled under the Act.

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir.

2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that plaintiff retained the RFC to perform her past relevant work. (Tr. 17.)


**V. DISCUSSION**

Plaintiff argues that the ALJ erred in determining her RFC, and that the VE's testimony does not constitute substantial evidence upon which the ALJ may rely at Step Four.

## A. RFC Determination

### 1. Objective Medical Evidence

Plaintiff argues the ALJ's RFC determination is not supported by medical evidence. The ALJ must assess RFC based on all the relevant evidence in the case record, including objective medical evidence of pain or other symptoms. 42 U.S.C. § 423(d)(5); 20 CFR § 404.1545. Thus, the record must include some medical evidence that supports the ALJ's RFC finding. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).

The record includes numerous medical records including records from three treating physicians, and the ALJ took them into consideration. (Tr. 204-366.) The ALJ also relied on Mr. Lossman's RFC Assessment. On September 02, 2008, Paul Lossman conducted an RFC assessment at the request of the Social Security Administration. (Tr. 264-69.) It is evident that the ALJ considered the medical records when making his disability determination as he cited several of those records (Tr. 15) and also declared the diagnoses included in the record as severe impairments, limited plaintiff's physical function according to the RFC Assessment, and determined that plaintiff is only capable of light work. (Tr. 16.)

Additionally, Dr. Cronin's recommendation that plaintiff return to work, Dr. Zohner's assessments that plaintiff was in overall good health, and Dr. Schlafly's notes of continual progress after plaintiff's rotator cuff tear repair all support the RFC finding; none of the claimant's treating physicians opined she was unable to work. See Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005). The record also includes treatment histories of the rotator cuff tear repair, improvement with physical therapy of the plaintiff's back, and Dr. Cronin's releasing plaintiff to return to work shortly before plaintiff's alleged onset date. See Dykes v. Apfel, 223 F.3d 865,867 (8th Cir. 2000) (upholding the ALJ's RFC determination where the record revealed a treatment history and one physician released the claimant to work, even absent a functional

assessment).  It is significant that no physician who examined plaintiff found limitations consistent with disability.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("There is no indication in the treatment notes that either Dr. Freiman or any of Choate's other doctors restricted his activities, or advised him to avoid prolonged standing or sitting.").

The ALJ's RFC determination is supported by substantial medical evidence.

### 2.  Duty to Fully and Fairly Develop the Record

Plaintiff argues the ALJ's finding that she can perform light work is not supported by medical evidence.  Plaintiff argues that the ALJ should have obtained additional evidence regarding her ability to perform light work. The ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision.  See 20 C.F.R. § 404.1527(c)(3).  The ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.  Jones v. Atrue, 619 F.3d 963, 969 (8th Cir. 2010).

In this case, no crucial issues were undeveloped.  Dr. Zohner reported that plaintiff was in overall very good health and the physical portion of her exam in June 2009 was unremarkable.  (Tr. 344.)  Dr. Schlafly's last report regarding plaintiff's recovery from her rotator cuff repair and therapy for her frozen shoulder stated that plaintiff continued to make progress.  (Tr. 246.)  Plaintiff did not seek further treatment after receiving a Cortisone injection in her knee due to arthritis pain.  (Tr. 340.)  Dr. Cronin released plaintiff to work after her gallbladder surgery shortly before plaintiff's alleged onset date.  (Tr. 207.)  And, physical therapy had effectively reduced plaintiff's back pain when she was receiving treatment.  (Tr. 228.)

Further, there are no ambiguities to be resolved because there is no evidence that any of plaintiff's medical providers believed that she had any work-related limitations.  See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) ("[T]he claimant's failure to provide medical evidence with this information [i.e. work-related restrictions] should not be held against the ALJ when there is medical evidence that supports the ALJ's

decision."). It is plaintiff's burden at Step Four to prove that she cannot perform PRW. Id. Therefore, the claimant's failure to provide medical evidence as to specific function in the workplace is not held against the ALJ when there is medical evidence that supports the ALJ's decision. Id.

The ALJ's duty to develop the record "includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue." Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004). Here, plaintiff's treating physicians have submitted records regarding each impairment at issue. (Tr. 199; 243-263; 304; 340; 344.)

Thus, the ALJ did not err since he had substantial evidence on which to base his decision.

### 3. Plaintiff's Testimony

Plaintiff argues that her testimony supports the finding of disability. But, the ALJ found her testimony not credible to the extent it conflicted with the ALJ's RFC determination. The ALJ's credibility findings must be supported by substantial evidence on the record as a whole. Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004). Credibility questions concerning a plaintiff's subjective testimony are "primarily for the ALJ to decide, not the courts." Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003).

Here, the ALJ found plaintiff's testimony concerning the intensity, persistence, and limiting effects of her symptoms not totally credible in light of the medical evidence of record. (Tr. 11-12.) It is notable that plaintiff does not contest this finding. Furthermore, the ALJ considered plaintiff's primary physician's statement that as of July 2009 plaintiff continued "to be in very good health" overall and that plaintiff's physical examination was unremarkable. (Tr. 15, 344.) And Dr. Zohner even recommended that plaintiff try to exercise daily. (Tr. 344.)

"Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Baldwin, 349 F.3d at 558(citing Polaski v. Heckler, 739 F.2d 878, 882 (8th Cir. 1987)). The

ALJ assessed plaintiff's testimony and determined that her subjective complaints were not credible because the medical reports revealed no condition that would limit plaintiff's ability to function in the workplace to a degree that rendered her disabled. (Tr. 15-16.) Plaintiff's testimony was "undermined by the lack of ... significant restrictions placed on his activities by his doctors." Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999).

The ALJ also noted that plaintiff's daily activities were inconsistent with her allegations of disabling back pain. (Tr. 13-14.) See Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations.") Plaintiff testified that she drove, did light housework, went to the grocery store, and did some vacuuming. (Tr. 37.) She stated she walked the perimeter of her three-acre lot, and weeded her garden. (Tr. 38-39.) Plaintiff also told Dr. Zohner in 2008 and 2009 that she walked at least one mile, two or three times a week. (Tr. 271, 368.) When plaintiff completed the Duke Activity Status questionnaire, she indicated she was able to take care of her personal needs, climb a flight of stairs, run a short distance, do light and moderate house work, and participate in moderate recreational activities. (Tr. 358.) "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain," Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009), and reflect negatively upon plaintiff's credibility. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001).

The ALJ further noted that plaintiff had not sought aggressive treatment for her allegedly disabling back and shoulder pain. (Tr. 15.) Plaintiff's failure to seek treatment from a back specialist or pain management specialist, and her failure to follow up with her shoulder surgeon discount her claims of disabling pain. See Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) (In particular, [a] failure to seek aggressive treatment is not suggestive of disabling back pain.)(quotations omitted).

Because plaintiff's daily activities, medical reports, and failure to seek aggressive treatment support the ALJ's decision, the ALJ's

credibility findings are supported by substantial evidence on the record as a whole. <u>Tucker</u>, 363 F.3d at 783. The ALJ's credibility determination is accompanied by a detailed statement explaining the reasons for finding a lack of credibility. (Tr. 15-16); <u>Dipple v. Astrue</u>, 601 F.3d 878, 880 (8th Cir. 2010). The ALJ also considered the factors set out in <u>Polaski</u> including the claimants daily activities, precipitating and aggravating factors, and functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1986). The court defers to the ALJ's credibility findings because the ALJ explicitly discredited the plaintiff's testimony and gave good reasons for doing so in light of medical evidence, daily activities, and lack of aggressive treatment for pain. <u>See</u> <u>Schultz v. Astrue</u>, 479 F.3d 979, 983 (8th Cir. 2007).

The ALJ committed no error in discounting plaintiff's credibility.

**B. VE's Testimony**

Plaintiff argues the ALJ improperly relied upon the VE's answer to the hypothetical question in determining she was not disabled.

**1. Mental Demands of PRW**

Plaintiff argues the ALJ erred by failing to make explicit findings as to the mental demands of her PRW. Plaintiff, however, did not allege disability on the basis of mental impairments. Plaintiff neither alleged a severe mental impairment in her application for benefits, nor did she argue the ALJ erred in not including mental limitations in her RFC determination. The ALJ need not investigate claims not alleged in the application for benefits or disclosed during the hearing. <u>Gregg v. Barnhart</u>, 354 F.3d 710, 713 (8th Cir. 2003). Further, when asked which problems interfered with her ability to work, plaintiff testified that the problems were with her arm, shoulder, back, and knee. (Tr. 34-36.) The only record evidence of a mental impairment is plaintiff's testimony that she has difficulty concentrating, plaintiff's testimony that her pain medication made her drowsy, and prescription records. (Tr. 36, 201.) <u>See</u> <u>Page v. Astrue</u>, 484 F.3d 1040, 1043-44 (8th Cir. 2007) (holding claimant did not have severe mental impairment despite

prescription for anti-depressants).  Given the absence of evidence or
allegations of a mental impairment, the ALJ did not err in not including
mental limitations in his RFC determination or his PRW analysis.
Harrison v. Astrue, No. Civ-08-253-M, 2009 WL 767672, at *4 (W.D. Okla.
Feb. 24, 2009) ("The ALJ was not required to specify the mental demands
of [the claimant's] PRW because he found [the claimant's] mental
impairments to be non-severe.); Smith v. Astrue, Civil No. 2:10-CV-02092,
2011 WL 1843194, at *4 (W.D. Ark. May 16, 2011) (the ALJ had no duty to
evaluate mental demands of the claimant's PRW when the claimant does not
suffer from a severe mental impairment).

Therefore, the ALJ did not err by not considering the mental demands
of plaintiff's PRW when calculating her RFC.

## 2. Function by Function Analysis

Plaintiff argues that the ALJ's findings regarding her ability to
meet the demands of her PRW are deficient because the ALJ did not
articulate a function-by-function analysis regarding her PRW.

At Step Four, the ALJ must make "explicit findings" concerning the
physical and mental demands of the claimant's PRW, and "to compare those
demands with her RFC to determine whether she could perform the relevant
duties."  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  The
Commissioner can rely upon typical job descriptions in the Dictionary of
Occupational Titles.  20 C.F.R. § 404.1566(d)(1).  The regulations also
provide that the ALJ may elicit testimony from a VE in evaluating a
claimant's capacity to perform PRW.  20 C.F.R. § 404.1560(b)(2).

In this case, the ALJ determined that plaintiff retained the RFC to
perform light work except that she could only occasionally climb stairs
and ramps, kneel, and crouch; never crawl or climb ropes, ladders, or
scaffolds; and could frequently reach in all directions. (Tr. 12.)  The
ALJ then identified plaintiff's PRW as a customer services
representative, waitress, and production assembler. (Tr. 16.)

The ALJ satisfied his duty to make explicit findings by *expressly*
referring to the DOT's specific job description of the claimant's past
work.  Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1991).  In
comparing plaintiff's RFC to her PRW, the ALJ included direct citations

to the relevant entries of the <u>Dictionary of Occupational Titles</u>. (Tr. 16) (citing United States Department of Labor, <u>Dictionary of Occupational Titles</u> §§ 279.357-054, 311.477-030, and 706.687-010 (4th ed. 1991), <u>available at</u> 1991 WL 672548, 1991 WL 672688, and 1991 WL 679074, respectively). Looking to the DOT, each of these jobs requires only light work, which means exerting no more than twenty pounds of force occasionally and/or up to ten pounds of force frequently, which the ALJ found plaintiff retained the RFC to perform based on the physician's findings in plaintiff's RFC Assessment. (Tr. 265.) Plaintiff challenges only the underlying analysis regarding, not the substance of, the ALJ's PRW findings. <u>See</u> <u>Cordell v. Astrue</u>, No. 1:08CV00016 JTR, 2009 WL399733, at *5 (E.D. Ark. Feb. 13, 2009) (noting that the claimant did not challenge that her PRW was actually performed at an exertional level greater than that found by the ALJ). The Eighth Circuit has stated that "[t]he ALJ may discharge [his duty to make "explicit findings regarding the actual physical and mental demands of the claimant's past work] by referring to the specific job descriptions in the <u>Dictionary of Occupational Titles</u> that are associated with the claimant's past work." <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 569 (8th Cir. 1999).

Further, the ALJ also considered the testimony of a VE. (Tr. 16.) At the hearing, the VE testified that a hypothetical claimant with claimant's RFC could perform claimant's PRW. (Tr. 47-48.) The ALJ may also rely on VE testimony to fulfill his obligation of evaluating whether a claimant retains the RFC to perform her PRW; such testimony can provide substantial evidence that claimant can return to her PRW. <u>Wagner v. Astrue</u>, 499 F.3d 842, 853-54 (8th Cir. 2007).

Therefore, the ALJ's analysis of plaintiff's PRW and the resulting testimony from the VE are supported by substantial evidence.

### 3. **Proper Hypothetical Question**

Plaintiff argues that the hypothetical question posed to the VE was flawed. Testimony from a VE based on a proper hypothetical constitutes substantial evidence. <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996). To be a proper hypothetical, it must completely describe a claimant's individual impairments. <u>Howe v. Astrue</u>, 499 F.3d 835, 842 (8th Cir.

2007).  Furthermore, the question must include only those impairments determined by the ALJ to actually exist, supported by substantial evidence, and not those impairments rejected by the ALJ.  <u>Id</u>.

When a VE's testimony is based on an accurately phrased hypothetical capturing the concrete consequences the claimant's limitations, it is substantial evidence supporting the ALJ's decision.  <u>See</u> <u>Robson v.</u> <u>Astrue</u>, 526 F.3d 389, 392 (8th Cir. 2008).

As discussed above, the ALJ's RFC determination was supported by substantial evidence.  Thus, the VE's testimony to the hypothetical based on that RFC is also supported by substantial evidence.  Because the RFC was based on substantial evidence then the resulting testimony from the VE is also substantial evidence.

Thus, the ALJ did not err in determining plaintiff could perform her past relevant work.

## VI.  CONCLUSION

For the reasons set forth above, the court concludes that the decision of the ALJ is supported by substantial evidence on the record and is consistent with the applicable law.  The decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

_____/S/___David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 27, 2011.